In the Matter of the Estate of SHERMAN McNEIL, Deceased.

Surrogate's Court, Washington County, August 20, 1962.

*Briggs, Wilson & Tomasi* for petitioner. *Charles B. Russell,* as special guardian for the infant respondents.

ROBERT W. BASCOM, S. Incidental to this proceeding for the settlement of the account of the executrix of the will of Sherman McNeil, dated February 16, 1951, we are called upon to construe the meaning and effect of the fifth clause thereof. An estate in excess of $340,000 in personalty, in addition to three parcels of real property is involved.

After providing for payment of debts and expenses there are devised and bequeathed to a nephew, Lincoln McNeil, by the second clause, three parcels of real property together with certain tangible personalty thereon, on certain conditions relative to the nephew's continuing to occupy and maintain a portion of the property during the lifetimes of testator and his maiden sister, Elizabeth, and providing care for the testator and his said sister during their lives. Should the conditions not be complied with, the property was to be sold and the proceeds become a part of the residue. The third clause provided a power of sale of other realty, while the fourth provided a cash bequest to the said sister, then residing with the testator, if she survived him, in lieu of any claim she might have against the estate for services or otherwise.

Then came the contentious FIFTH clause, which, except for the subsequent appointment of the executrix, constitutes the balance of the will and reads as follows:

" FIFTH. All of the remainder of my property shall be divided by my executor into a number of shares equal to the number of brothers or sisters surviving me and the number of deceased brothers or sisters who have left children surviving them and I give, devise and bequeath the said remainder as follows:

" A. One (1) share to my executor to be held in trust by her for the benefit of my sister, Elizabeth McNeil, and I authorize my executor or her successor, to hold the same and to invest the same in such manner or in such securities as she may deem for the best interests of said trust fund and to pay therefrom out of

either income or principal, so much thereof as may be reasonable and necessary for the comfortable maintenance and support of my said sister during her lifetime. Upon the death of my said sister, Elizabeth McNeil, I give, devise and bequeath whatever may remain of said share to my nephews and nieces to be divided among them equally share and share alike.

"B. One (1) share to Earl McNeil and Loren McNeil to be held in trust for the benefit of my brother, James McNeil, and I authorize and direct them to invest the said trust fund in such manner as they may deem for the best interests of the same, and to pay over to my brother, James McNeil, the income therefrom during his lifetime. Upon the decease of my brother, James McNeil, the said share shall be divided equally among his children.

"C. One (1) share to the children of each deceased brother and sister, such share to be divided equally among his or her children respectively."

In addition to the sister, Elizabeth, testator had five brothers, James, Hugh, Henry, Charles and Harvey. At the time the will was made only James and Elizabeth were living. All the brothers had children living at the time of the execution of the will, James having two, Hugh four, Henry three, Charles four and Harvey one. In addition, a son of Harvey had died in 1934 leaving two children, one of whom subsequently predeceased the testator, leaving in turn two children, a great-grandnephew and great-grandniece of testator, one of whom is an infant. One of the children of Charles died subsequent to the making of the will and before the testator, leaving four children, grandnephews and grandnieces of testator, three of whom are infants. Also, one of Henry's sons died six weeks after the will was made, in turn leaving a son now living. Testator's sister Elizabeth had no descendants, and both she and brother James predeceased the testator.

Who of these 20 living collateral relatives of Sherman McNeil share in his residuary estate and in what proportions is to be determined. In the construction of any will the sole problem to be solved is what the particular testator intended at the moment the will was executed, by the language employed, when the will is read as a whole, in the light of the circumstances then surrounding him and the pertinent existing law. (*Matter of Crespi,* 158 Misc. 383.) It is fundamental that in seeking this intent, decisions construing other wills of differing phraseology and circumstances are of little or no value. (*Matter of Corlies,* 150 Misc. 596.)

A literal translation of the FIFTH clause, standing alone, is that testator directed the " remainder " of his property to be divided

into five shares (there being no brothers or sisters surviving him and there being five deceased brothers who left children surviving them) and that he then proceeded to dispose of seven shares, namely, one in trust for the benefit of Elizabeth, with remainder over to all nephews and nieces equally; one share in trust for James, with remainder over to the children of James, and one share to each of the five sets of children of the five deceased brothers. (See *Nicholas* v. *Farmers' Loan & Trust Co.*, 224 App. Div. 540.) Such division and distribution is of course impossible.

It is strongly urged upon us, by both the executrix and the special guardian, that the true meaning and intent of the clause is that since the opening paragraph thereof directs a division into what, by computation, happens to be the same number of shares as there were sets of children of predeceased brothers, and since neither James nor Elizabeth lived to enjoy their legacies, subdivisions A and B are entirely to be disregarded and distribution made under subdivision C, per stirpes, to all 20 nephews, nieces, grandnephews, grandnieces, great-grand-nephews and great-grandnieces, as though testator had died intestate as to the residue.

If this were testator's design, he certainly chose the most incongruous, unsuitable and unwieldy language that can be imagined to say that if all his brothers and sister predeceased him his residuary estate was to be distributed according to the laws of intestate succession. The argument overlooks the fact that two different groups of persons have vested, accelerated remainders of different amounts under subdivisions A and B, and it requires the excision of two whole subdivisions, which is a procedure resorted to only in desperation and as a last resort. It is apparent, however, that some judicial surgery must be performed on this testament to produce a workable result in keeping with testator's wishes.

The will as a whole discloses that the intent of the maker was first to provide an inducement to nephew Lincoln to continue managing the realty and taking care of testator and his maiden sister and to reward him for so doing; secondly to compensate said sister, if she survived, for services rendered; finally, to distribute the balance of the estate equally among his brothers and sister, with the children of those who were dead taking their parents' share per stirpes and with the childless Elizabeth's invadable share to be divided among all nephews and nieces, per capita, on her death. When viewed in this light, it is not difficult to translate the formula of the FIFTH clause into a worka-ble design. In any contingency referable to the deaths of James

and Elizabeth the residue would have been divided into either five or six shares. In the event neither survived, as happened, or had James alone survived, the formula produces five shares. If, however, Elizabeth alone had survived, or, if both James and Elizabeth survived, a division into six shares would have been required. Thus the chances that the intent was to produce a division of the residue into sixths are equally as good as a division into fifths

The draftsman's formula, as pointed out above, requires distribution of seven shares when there could only have been either five or six shares in any event, and it calls for James' children to get two shares, one under subdivision B and one under C. Since the will as a whole indicates no desire by the testator to favor the children of one of his brothers over those of another, and since we do not impute to him a plan to produce an unworkable testament, we conclude that the intent of clause FIFTH was to divide the residue into six shares and to distribute six shares, with the children of James receiving only one share in addition to their interest in Elizabeth's share. In short, and referable to the time of execution of the will, the words "brothers or sisters surviving me", in the opening sentence of the FIFTH clause, are to be read as "brothers or sisters now living", and subdivision C is to be read as though it were "C. One (1) share to the children of each *now* deceased brother and sister, such share to be divided equally among his or her children respectively."

This leaves for determination only the question of whether the descendants of the predeceased nephews share in the residue. It is argued that since the opening sentence of the FIFTH clause directs a division into a number of shares represented by deceased brothers who left children surviving them, regardless of whether such children survived the testator, that this imports a design to include more remote descendants in the meaning of the word "children", for the reason that otherwise, if any predeceased brother had left children surviving him, but not surviving the testator, that share would lapse and devolve as intestate property, a proposition foreign to testator's intent. We are not persuaded by the argument. The descendants of Clayton, son of testator's brother Harvey, certainly cannot take through him, as Clayton was dead when the will was made. (*Matter of Turner,* 208 N. Y. 261, 268; *Pimel* v. *Betjemann,* 183 N. Y. 194, 199.)

Here the gift under subdivision C of the FIFTH clause is to children of deceased brothers. It is well settled that the word "children" is never interpreted to include grandchildren or

more remote descendants unless the will as a whole shows that unmistakable intent. (*Matter of Villalonga*, 6 N Y 2d 477; *Matter of Schaufele*, 252 N. Y. 65; *Matter of King*, 217 N. Y. 358; *Matter of Phipard*, 182 App. Div. 357, affd. 223 N. Y. 676; *Matter of Keogh*, 126 App. Div. 285, affd. 193 N. Y. 603.) This is even more true where the grandchildren are those of a collateral relative rather than grandchildren of the testator as in the case of *Prowitt* v. *Rodman* (37 N. Y. 42). Hence, a contingency which never occurred, but which, if it had happened, would have caused intestacy as to small fractional part of the residue, can hardly be relied on as showing testator's " unmistakable intent " to include his brothers' grandchildren and great-grandchildren in his bounty.

The gift under subdivision A is to " my nephews and nieces ". The rule here is the same. The words do not ordinarily include grand and great-grand nephews and nieces. (*Matter of Woodward*, 117 N. Y. 522; *Matter of Richards*, 150 Misc. 102; *Cromer* v. *Pinckney*, 3 Barb. Ch. 466.)

We conclude therefore, that clause FIFTH is to be interpreted as calling for a division of the residue into six parts, one of which, under subdivision A is to be distributed per capita to the 12 nephews and nieces of the testator, living at his death, to the exclusion of the descendants of the three predeceased nephews; one share is to be distributed under subdivision B to the two sons of James, and four shares are to be distributed under subdivision C as follows: one to the four children of Hugh, one to the two living children of Henry to the exclusion of the child of Henry's deceased son, Sherman, one to the three living children of Charles, to the exclusion of the children of Charles' deceased son, David, and one to the living child of Harvey, to the exclusion of the children and grandchildren of Harvey's deceased son, Clayton. The account is settled and allowed as filed.